# IN THE COURT OF APPEALS OF IOWA

No. 14-0787
Filed January 27, 2016

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**NATHAN DANIEL RONNAU,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Scott County, Marlita A. Greve, Judge.

A defendant appeals his jury conviction for first-degree kidnapping, first-degree sexual abuse, and willful injury causing serious injury.  **AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Nan Jennisch, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Kevin Cmelik and Sheryl Soich, Assistant Attorneys General, for appellee.

Heard by Vaitheswaran, P.J., and Doyle and Mullins, JJ.

**MULLINS, Judge.**

Nathan Ronnau appeals from his jury conviction and sentence for kidnapping in the first degree, sexual abuse in the first degree, and willful injury causing serious injury. Ronnau challenges the sufficiency of the evidence for his conviction of first-degree kidnapping. He further contends the district court erred in denying his motion for new trial because the jury's verdict was contrary to the weight of the evidence. Ronnau also alleges his attorney was ineffective in failing to object to the jury instructions defining the crime of first-degree kidnapping. We affirm.

## I.    Background Facts and Proceedings

On the evening of July 1, 2013, A.M. went to a bar at the corner of East Locust Street and Iowa Street in Davenport to meet a friend. She had five alcoholic drinks at the bar and later left with Christopher McCray, whom she did not previously know, just before closing time to go to his home and smoke marijuana. Later, A.M. realized she had left her phone, keys, and cigarettes at the bar, so McCray drove her back to the bar after it had closed and helped her knock on the bar's back door to retrieve her belongings. The bar manager responded to the knocks through the door but did not allow A.M. to come in. He told her he could not find her things and suggested she check back later. Ronnau had followed McCray into the area and sat on a bench next to the bar's back door, smoking a cigarette. After a few minutes, A.M. sat down next to him and asked him for a cigarette. Ronnau handed her the cigarette he had been smoking. McCray then had a brief conversation with A.M., and after checking

with her to make sure she was comfortable with him leaving her there, McCray left in his vehicle. A.M. and Ronnau sat together on the bench for several minutes. Ronnau introduced himself to A.M. as "David." At one point, Ronnau tried to lean in and kiss A.M., but she pulled away from him. She stood up because she started to feel uncomfortable and knocked on the bar's back door again.

After not receiving a response to her knocking, A.M. left the bar at approximately 2:50 a.m. and started walking south on Iowa Street. Ronnau followed her. He called out to her asking for a cigarette. A.M. responded she could not find her cigarettes and had just asked him for one. Ronnau caught up to her about a block from the bar, next to an open lot, and put his arm around her. Ronnau asked A.M. if she would walk him home. A.M. asked him where he lived. Ronnau then put his arm around A.M.'s neck and began applying pressure to her throat with the crook of his elbow. A.M. started experiencing difficulty breathing and fell to the ground hard. She could hear Ronnau looking through her purse and thought he said he was looking for a gun. A.M. then fell unconscious.

When A.M. woke up, she was across the street, lying in a bush up against the west exterior wall of the Dollar General store, with Ronnau on top of her. Ronnau was choking her, and she was unable to do anything. A.M. tried screaming, but Ronnau grabbed her tongue with his fingernails and tried pulling it out. Ronnau said he had a knife and threatened to kill her. A.M. tried fighting back, punching Ronnau and scratching him on his left cheek. Ronnau started

hitting A.M. harder with a closed fist. She had a bloody nose, and her tongue was bleeding and missing a small chunk. At some point, A.M. had lost control of her bodily functions and defecated on herself while Ronnau was strangling her.

Ronnau penetrated her vagina and anus with his penis. He then forced her to sit up and perform oral sex on him. A.M. feared Ronnau was going to kill her. She began pleading for her life—telling Ronnau she was a single mother of two children and screaming her ex-husband's name. Ronnau then ended the assault. He ran back north on Iowa Street and then east through the Dollar General and Save-A-Lot parking lot.

A.M. got up and tried to get dressed. She was missing her bra, her green underwear, one of her shoes, and her purse. Her shirt was torn. She did not know whether Ronnau was going to come back, so she left as quickly as she could. She walked to her boyfriend's house less than one-half mile away. She tried knocking on someone's door for help along her way, but no one answered. A.M. reached her boyfriend's duplex around 3:30 a.m. She pounded on the front door to the duplex, and John Lopez, who lived on the first floor of the duplex, let her in. Lopez observed A.M. to look "beat up" and "dirty." He saw that her mouth and tongue were bleeding, her hair had leaves in it, her neck had scratches and red marks everywhere, she smelled like feces, her left breast was exposed through a tear in her muddy shirt, her pants were dirty and unbuttoned, and she was missing a shoe. A.M., visibly shaking and clearly traumatized, told Lopez she had just been beaten and raped. A.M. told Lopez her attacker was a white

male with brown hair who had either blue shorts or a blue shirt on.[1] Lopez also thought A.M. said she had been assaulted by the "Latin Kings," though A.M. stated later she thought she had been called a "Latin King Woman" during the assault. Lopez had difficulty understanding her because her tongue "was all swollen, purple, [and] bleeding." Lopez tried calling A.M.'s boyfriend but could not reach him, so he dialed 911 and handed the phone to A.M. A.M. hung up the phone. The operator returned the call and dispatched officers to her location at 3:41 a.m.

The officers arrived at A.M.'s location. A.M. experienced difficulty, both physical and emotional, in discussing the incident with the officers. During transport to the hospital by ambulance, A.M. complained of throat and neck pain and informed the paramedic she had been choked and lost consciousness during the attack. She described her attacker for the paramedic as a white male, in his twenties or thirties, around five foot six inches tall, with either dark blond or brown, buzz-cut hair, and wearing a blue shirt. The paramedic later gave this description to an officer at the hospital.

Another officer left to search for a suspect matching A.M.'s description but was unsuccessful. The officer then went to the crime scene where he observed A.M.'s bra in a bush on the east side of Iowa Street next to the Dollar General and her missing balled-up sock north of the bush along Dollar General's exterior wall. The officer found A.M.'s purse and missing shoe on the sidewalk across the street and north of where he had found her bra and sock, next to an open lot.

---

[1] Lopez originally told police A.M. had said her attacker was wearing blue shorts. However, at trial, Lopez testified A.M. could have said either blue shorts or a blue shirt.

He also noticed the grass just west of the sidewalk was matted down and had bloodstains in it.  The officer was unable to find A.M.'s green underwear.

At almost 4:00 a.m., firefighters were dispatched to a location 1.1 miles from the bar after receiving a report that a man was asleep on the steps of a residence.  The firefighters woke the man, who refused assistance and immediately left the area.  The firefighters described him as a white male between five feet eight inches and six feet tall.

A.M. arrived at the hospital's emergency room at 4:09 a.m.  Due to a fatal shooting earlier that night, A.M. was taken to an examination room, where she waited for over an hour to be seen by medical personnel.  A.M. became frustrated with having to wait while covered in her own blood and feces, and went to the bathroom to urinate and clean herself with paper towels.  A.M. was later evaluated by medical personnel and cleared for a forensic examination.  From approximately 7:00 a.m. until 1:00 p.m., a Sexual Assault Nurse Examiner (SANE nurse) conducted a sexual assault examination of A.M.  The SANE nurse observed debris and tenderness in A.M.'s vaginal area, and tenderness and redness at the opening of her anus.  During the examination, the SANE nurse noticed A.M.'s neck had started to swell, her voice had become hoarse, and she was having difficulty swallowing.  Due to the swelling of her neck while at the hospital, medical personnel conducted several tests, including a CT scan, which revealed fluid stranding in her left upper neck.  Medical personnel gave A.M. medication to stop the swelling in her neck and released her that afternoon.  A.M. had deep bruises on both of her knees and had cuts, bruises, redness, swelling,

and tenderness on her nose, forehead, chin, neck, knees, breasts, knuckles, elbow, arm, and scalp. A.M. also complained of pain in her throat, the back of her neck, and her lower back.

Later that day, officers searched Ronnau's apartment and seized two blue dress shirts, a pair of dress pants, and menthol cigarettes. On July 3, A.M. positively identified Ronnau as her attacker in a photo array, and the officers subsequently arrested Ronnau. The officers obtained a second search warrant to collect evidence from Ronnau's person and took photographs of his injuries. Ronnau had a scratch on his left cheek, a small circular mark under his chin, bruising on his right eyebrow, redness around his knuckles, small red marks on his right wrist and hand, and scrapes on his left bicep and both knees.

On August 1, the State filed a trial information charging Ronnau with one count of first-degree kidnapping, a class "A" felony, in violation of Iowa Code sections 703.1, 710.1(3), 710.1(4), and 710.2 (2013); one count of first-degree sexual abuse, a class "A" felony in violation of sections 703.1, 709.1(1), and 709.2; and one count of willful injury causing serious injury, a class "C" felony, in violation of sections 702.18, 703.1, and 708.4(1).

A jury trial was held March 10–17, 2014. A.M. testified she suffered serious injuries as a result of Ronnau strangling her during the attack. She stated her voice was affected for four or five months after the attack and was still experiencing some "crackling in it" at the time of trial. A.M. testified she had lost her job in sales because of her inability to talk and control the tone or volume of her voice. The SANE nurse and an ear, nose, and throat (ENT) expert physician,

who did not personally examine A.M., both testified A.M. was subject to a substantial risk of death as a result of Ronnau strangling her.

Ronnau's co-worker testified he was with Ronnau at the bar on the night of the attack but left the bar around 2:00 a.m. without Ronnau. He further testified he observed Ronnau the next day at work with several scratches. He thought Ronnau was "acting a little funny," and noticed Ronnau made a point to tell him numerous times throughout the day that he had passed out on someone's porch on his walk home from the bar the night before and was woken by an ambulance or paramedics who allowed him to leave and walk home. He also testified Ronnau told him that during his walk home he had gotten "into a fight with a tree," fell into the tree, and the tree won. He testified he did not see any scratches on Ronnau when he saw him the night before at the bar.

Kurt Brookhart, a cellmate of Ronnau's at the Scott County Jail, testified regarding conversations he had with Ronnau about the attack after Ronnau approached him with a request for legal advice. Ronnau told Brookhart he was intoxicated on the night in question and could not remember much of what happened. Ronnau admitted to Brookhart that he shared a cigarette with A.M. and that he tried getting her to go home with him. Ronnau stated he had approached A.M. from behind after she left the bar, put his arms around her, and then she fell. He told Brookhart the next thing he remembered was sitting by a wall before a struggle broke out and A.M. was hitting him. He remembered having A.M. face down but said he did not remember why. He remembered grabbing her by her hair and forcing her to perform oral sex on him. Ronnau told

Brookhart A.M. started "getting loud," would not "shut up," and kept "just going on about her kids." Ronnau stated he "freak[ed] out," "smack[ed]" her, and "[took] off down Locust Street." He talked to Brookhart about waking up on someone's lawn and then waking up again on someone's steps before walking home. Ronnau told Brookhart he started to realize what had happened and wanted a cigarette. When Ronnau reached into his pocket, he pulled out A.M.'s green underwear and some papers of hers, which he threw away in a trash bin on his way home.

No forensic evidence linked Ronnau to the attack. No seminal fluid or DNA matching Ronnau could be found in any samples taken from A.M., her clothes, or the paper towels that were recovered after she cleaned herself at the hospital.[2] Likewise, no DNA matching A.M. could be found on any samples taken from Ronnau or his clothes. An Iowa Division of Criminal Investigation (DCI) criminalist testified there are many reasons why seminal fluid may not be found after a sexual encounter, including if the male wore a condom, if no ejaculation occurred, or if the male had a low sperm count. She also testified foreign DNA cannot always be detected in a woman's vagina following a sexual assault given how many millions of the woman's cells are present. She stated A.M.'s cleaning herself with wet paper towels and urinating after the attack at the hospital, as well as any bacteria present in the anal region or saliva in her mouth, could have diluted or washed away any foreign DNA prior to gathering samples.

---

[2] A.M. told the SANE nurse after the attack, and later testified at trial, that she did not know whether Ronnau had ejaculated during the attack.

Ronnau did not testify at trial. He moved for judgment of acquittal after the State rested and again at the end of all of the evidence. The court denied both motions. On March 17, 2014, the jury found Ronnau guilty of one count of first-degree kidnapping, one count of first-degree sexual abuse, and one count of willful injury causing serious injury. On April 29, 2014, Ronnau filed a motion for new trial. On May 8, 2014, the court denied Ronnau's motion and sentenced him to life without the possibility of parole for first-degree kidnapping pursuant to section 902.1.[3] Ronnau appeals.

## II.     Scope and Standard of Review

"On the issue of sufficiency of the evidence, we review claims for correction of errors at law." *State v. Robinson*, 859 N.W.2d 464, 467 (Iowa 2015). A jury finding of guilt will only be disturbed if it is not supported by substantial evidence. *Id.* "Substantial evidence" is evidence that would convince a rational trier of fact the defendant is guilty beyond a reasonable doubt. *Id.* At trial, the State must prove every element of the crime charged beyond a reasonable doubt. *State v. Gibbs*, 239 N.W.2d 866, 867 (Iowa 1976). The State's evidence must raise a fair inference of guilt and do more than create speculation, suspicion, or conjecture. *State v. Hamilton*, 309 N.W.2d 471, 479 (Iowa 1981). In weighing the evidence, direct and circumstantial evidence are equally probative. Iowa R. App. P. 6.904(3)(p). On appeal, we look at the record as a whole, considering all of the evidence, and view it in the light most favorable to the State. *Robinson*, 859 N.W.2d at 467. We review a district court's ruling on

---

[3] The sexual abuse and willful injury convictions merged into the first-degree kidnapping conviction at the time of judgment and sentencing.

a motion for new trial based on whether the verdict was contrary to the weight of the evidence for abuse of discretion. *State v. Thompson*, 836 N.W.2d 470, 476 (Iowa 2013). We review claims of ineffective assistance of counsel de novo. *State v. Thorndike*, 860 N.W.2d 316, 319 (Iowa 2015).

### III. Analysis

Ronnau challenges the sufficiency of the evidence for his conviction of first-degree kidnapping. Alternatively, he claims his attorney did not properly challenge the elements of first-degree kidnapping in moving for judgment of acquittal. Ronnau further contends the district court erred in denying his motion for new trial because the jury's verdict was contrary to the weight of the evidence. Ronnau also alleges his attorney was ineffective in failing to object to the jury instructions defining the crime of first-degree kidnapping and the element of confinement and removal.

*A. Sufficiency of the Evidence*

A person commits the offense of kidnapping when the person either confines another person or removes another person from one place to another, without the consent or authority of the other person and with the "intent to inflict serious injury upon such person, or to subject the person to a sexual abuse." Iowa Code § 710.1(3). First-degree kidnapping is defined as "when the person kidnapped, as a consequence of the kidnapping, suffers serious injury, or is intentionally subjected to torture or sexual abuse." Iowa Code § 710.2.

Ronnau argues the State failed to present substantial evidence to support his conviction for first-degree kidnapping based upon a sexual assault.

Specifically, he challenges the elements of "confinement or removal" and "serious injury."[4]

### 1. Confinement or Removal

Ronnau contends the State presented insufficient evidence to support the verdict because any confinement or removal A.M. experienced did not have any "significance independent from [the commission of] sexual abuse" but rather, was merely incidental to the underlying sexual attack. *See State v. Rich*, 305 N.W.2d 739, 745 (Iowa 1981). He further claims any such confinement or removal did not *substantially* increase the risk of harm to A.M., *significantly* lessen the risk of detection, or *significantly* facilitate his escape following the commission of the sexual abuse. *See id.* Ronnau alleges the State did not present any direct evidence that he confined or removed A.M. from the west side of Iowa Street to the east side of Iowa Street and there was no evidence that any confinement or removal occurred beyond that ordinarily associated with the underlying offense of sexual abuse. Ronnau claims it was "unclear *where* [A.M.] collapsed on the street," and A.M. did not know how long she had been unconscious or how she got into the bush on the east side of Iowa Street.

---

[4] The State argues Ronnau failed to preserve error on the element of confinement or removal by not specifically challenging the requirement that any confinement or removal must be "more than incidental" to the sexual abuse in his motion for judgment of acquittal at trial. *See State v. Truesdell*, 679 N.W.2d 611, 615 (Iowa 2004) ("To preserve error on a claim of insufficient evidence for appellate review in a criminal case, the defendant must make a motion for judgment of acquittal at trial that identifies the specific grounds raised on appeal."). In his motion for judgment of acquittal, Ronnau argued there was "no direct evidence that Mr. Ronnau moved [A.M.]." In making its ruling on Ronnau's motion, the district court found "[A.M.'s testimony] that [Ronnau] subjected her to sexual abuse vaginally and anally and forced her to give him oral sex, all of which would satisfy the sex act requirement along with moving across the street would be the removal issue." We find Ronnau adequately preserved error on this issue.

The State points to evidence that an officer found A.M.'s purse and shoe on the west side of Iowa Street, approximately one block south of Locust Street, on the sidewalk next to an open lot. Just west of where her purse and shoe were found, the officer observed an area of the grass that was matted down and had bloodstains in it. It was 2:50 a.m. when Ronnau followed A.M. from the bar, put his arm around her, strangled her, and caused her to fall to the ground and pass out on the west side of Iowa Street. A.M. later woke up on the east side of Iowa Street in a bush next to the west exterior wall of the Dollar General. No one else was on the street, and although there was a street lamp nearby, the bush provided cover for the assault. A.M. testified Ronnau prevented her from screaming for help by trying to pull out her tongue with his fingernails and threatening to kill her with a knife. Ronnau told Brookhart he remembered putting his arm around A.M. and her falling down. Ronnau then remembered being on the other side of the street next to the wall where a struggle with A.M. occurred. Ronnau also remembered grabbing A.M. by her hair and forcing her to perform oral sex on him. He told Brookhart she had started to get loud, so he "freak[ed] out," "smack[ed]" her, and fled the scene.

Viewing the evidence in the light most favorable to the State, including all reasonable inferences that may be deduced from the record, we determine substantial evidence existed for the jury to find that as a consequence of Ronnau's acts of confinement or removal, A.M. was intentionally subjected to sexual abuse. A reasonable jury could find that Ronnau's strangling of A.M.—on the west side of Iowa street, on the sidewalk next to an open lot until she passed

out, and the subsequent transport of her to the east side of Iowa Street, into the shadows and concealment of a bush, next to an exterior wall of a closed commercial business at approximately 3:00 a.m.—substantially increased the risk of harm to A.M. and significantly lessened the risk of detection. *See Rich*, 305 N.W.2d at 745 ("[The] defendant did not choose the restroom for his sexual assault for the personal comfort of himself or his victim. Rather his actions indicate that he sought the seclusion of the restroom as a means of avoiding detection."). Further, Ronnau significantly lessened the risk of detection and significantly facilitated his escape from the scene of the attack by attempting to rip out A.M.'s tongue when she tried screaming, threatening to kill her with a knife, and beating her about the face before he fled the scene. Ronnau left A.M. in a bush, having been brutally raped and strangled, and missing some of her clothes. Based upon this evidence, we believe the record revealed sufficient evidence upon which a jury could find Ronnau guilty of first-degree kidnapping beyond a reasonable doubt. *See Robinson*, 859 N.W.2d at 481–82 (asking whether evidence presented "a sufficient basis to allow the jury to regard the case as presenting more than sexual abuse"). We will not disturb the jury's verdict on the first-degree kidnapping count.

2. Serious Injury

A "serious injury" is defined as any "disabling mental illness" or any "bodily injury" which "(1) [c]reates a substantial risk of death; (2) [c]auses serious permanent disfigurement; [or] (3) [c]auses protracted loss or impairment of the function of any bodily member or organ." Iowa Code § 702.18. A "bodily injury"

was defined for the jury as "physical pain, illness or any impairment of physical condition." A "substantial risk of death" was defined for the jury as "more than just any risk of death, but does not mean that death is likely."

Ronnau argues the State presented insufficient evidence A.M. suffered a serious injury to support his conviction for first-degree kidnapping. He contends that although the *act of strangulation* created a substantial risk of death, A.M. did not suffer a *specific bodily injury* that created such risk. He further asserts A.M. did not suffer a bodily injury causing permanent disfigurement such as scars. He contends her loss of consciousness and resulting loss of bodily control while being strangled were only temporary. And, he claims the prolonged effects of not being able to control the tone and volume of her voice for months after the attack were not a substantial interference with her vocal cords' function because she was still able to speak and did not completely lose her voice. Therefore, he argues, the injuries she suffered do not constitute a protracted loss or impairment of a bodily member or organ.

Viewing the evidence in the light most favorable to the State, we determine substantial evidence existed for the jury to find that Ronnau's strangulation of A.M. created a substantial risk of death or caused the protracted loss or impairment of the function of a bodily organ. Both the SANE nurse and the ENT expert physician testified that Ronnau's strangling of A.M. to the point she lost consciousness during the attack and the later swelling of her throat, which caused the potential for her airway to be blocked, created a substantial risk of death. Further, A.M. testified she suffered lingering adverse effects in her

voice and vocal cords for four or five months following the attack as a result of Ronnau strangling her. A.M. stated that at first she was not able to talk, later she could not control the tone or volume of her voice, and at the time of trial, she was still experiencing some "crackling" in her voice. Therefore, we find the record contained substantial evidence that A.M. suffered a serious injury and will not disturb the jury's verdict on the first-degree kidnapping count.

*B. Motion for New Trial*

Ronnau moved for new trial based on the claim that the jury's verdict of guilty was contrary to the weight of the evidence. He claims A.M.'s credibility was severely undermined because she had ingested alcohol and marijuana earlier that night and made contradictory statements regarding the attack. He also complains there was little forensic evidence supporting the allegations that A.M. was sexually assaulted. Finally, he alleges that any evidence A.M. sustained serious injuries as a result of the attack was minimal because her injuries eventually healed.

A trial court may grant a new trial "[w]hen the verdict is contrary to law or evidence." Iowa R. Crim. P. 2.24(2)(b)(6); *see also State v. Ellis*, 578 N.W.2d 655, 659 (Iowa 1998). A verdict is contrary to the weight of the evidence where "a greater amount of credible evidence supports one side of an issue or cause than the other." *Ellis*, 578 N.W.2d at 658 (quoting *Tibbs v. Florida*, 457 U.S. 31, 37–38 (1982)). "A trial court should not disturb the jury's findings where the evidence they considered is nearly balanced or is such that different minds could

fairly arrive at different conclusions." *State v. Shanahan*, 712 N.W.2d 121, 135 (Iowa 2006).

For the same reasons we found there was sufficient evidence to overrule the motion for judgment of acquittal, we cannot say the evidence preponderates heavily against the jury's guilty verdict. Accordingly, the district court did not abuse its discretion in denying Ronnau's motion for new trial. *See Thompson*, 836 N.W.2d at 491. We affirm the order denying Ronnau's motion for new trial.

### C. Ineffective Assistance of Counsel

To succeed on a claim of ineffective assistance of counsel, Ronnau must show by a preponderance of the evidence: "(1) his trial counsel failed to perform an essential duty, and (2) this failure resulted in prejudice." *Thorndike*, 860 N.W.2d at 320 (quoting *State v. Adams*, 810 N.W.2d 365, 372 (Iowa 2012)); *accord. Strickland v. Washington*, 466 U.S. 668, 687 (1984). Failure to prove either prong is fatal to the claim. *Shanahan*, 712 N.W.2d at 142. "[W]e measure counsel's performance against the standard of a reasonably competent practitioner." *Thorndike*, 860 N.W.2d at 320 (quoting *State v. Clay*, 824 N.W.2d 488, 495 (Iowa 2012)). Prejudice is the reasonable probability of a different outcome. *Ledezma v. State*, 626 N.W.2d 134, 145 (Iowa 2001). In examining Ronnau's claims, we presume his trial attorney performed his duties competently. *See Thorndike*, 860 N.W.2d at 320.

Ronnau alleges his trial attorney provided ineffective assistance by failing to object to the jury instructions defining (1) the crime of first-degree kidnapping and (2) the element of confinement or removal. An ineffective-assistance-of-

counsel claim may be raised and decided on direct appeal when the record is adequate to address the claim. Iowa Code § 814.7(2), .7(3). Here, the record is adequate to address Ronnau's claims.

1. First-Degree Kidnapping Marshalling Instruction

The challenged marshalling instruction stated:

> Under Count 1, the State must prove all of the following elements of Kidnapping in the First Degree:
> 1. On or about the 2nd day of July, 2013 in Scott County, Iowa, the defendant confined or removed [A.M.] from the west side of Iowa Street to the east side of Iowa Street.
> 2. The defendant did so with the specific intent to:
> a) inflict serious injury upon [A.M.]; or
> b) subject [A.M.] to sexual abuse.
> 3. The defendant knew he did not have the consent or authority of [A.M.] to do so.
> 4. As a result of the confinement or removal, [A.M.] suffered a serious injury or was subjected to sexual abuse or intentionally subjected to torture.

Ronnau asserts counsel should have objected because element 4 of the marshalling instruction does not correctly state the law on first-degree kidnapping since Iowa Code section 710.2[5] requires that the victim must suffer a serious injury, or be intentionally subjected to torture or sexual abuse, "*as a consequence of the kidnapping*" rather than "*as a result of the confinement or removal.*" He claims this element of the instruction does not explicitly reference the crime of kidnapping, which requires specific intent, but instead merely mentions "confinement or removal" without more. He argues the instruction allowed the

---

[5] Iowa Code section 710.2 provides in pertinent part: "Kidnapping is kidnapping in the first degree when the person kidnapped, *as a consequence of the kidnapping*, suffers serious injury, or is intentionally subjected to torture or sexual abuse." (Emphasis added.)

jury to convict him of first-degree kidnapping without proof that he committed the predicate kidnapping.

As the State argues, when the phrase "as a result of the confinement or removal" is read in context, it is clearly referring to the defendant's kidnapping of the victim. The rest of the instruction required that Ronnau confine or remove A.M. to the opposite side of the street, that he do so without her consent, and that he have the specific intent to seriously injure or sexually abuse her. Furthermore, it is clear that when the marshalling instruction is read in conjunction with the instruction defining confinement or removal, examined below, the jury instructions in this case correctly conveyed the law and elements of the offense of first-degree kidnapping. *See State v. Bennett*, 503 N.W.2d 42, 45 (Iowa Ct. App. 1993) ("In evaluating [jury instructions], we must read all of the instructions together, not piecemeal or in artificial isolation."). Accordingly, assuming Ronnau's trial counsel had a duty to object to the marshalling instruction, we cannot find Ronnau suffered prejudice as a result of counsel's omission.

2. Confinement or Removal Element

The challenged instruction[6] stated:

> In these instructions, "confinement" or "removal" requires more than what is included in the commission of the crime of Kidnapping. A person is "confined" when her freedom to move about is substantially restricted by force, threat or deception. The person may be confined either in the place where the restriction began or in a place to which she has been removed.

---

[6] The instruction tracked the uniform Iowa Criminal Jury Instruction 1000.5 (2012), promulgated by a committee of the Iowa State Bar Association and approved by our court in *State v. Ripperger*, 514 N.W.2d 740, 750 (Iowa Ct. App. 1994).

No minimum time of confinement or distance of removal is required. It must be more than slight. The confinement or removal must have significance apart from the suffering of serious injury, or sexual abuse or intentional torture.

In determining whether confinement exists, you may consider whether:
1. The risk of harm to [A.M.] was increased.
2. The risk of detection was reduced.
3. Escape was made easier.

Ronnau contends counsel should have objected because the jury instruction was missing critical "intensifiers" required by our case law. Under *Rich*, the risk of harm to the victim must be *substantially* increased, the risk of detection must be *significantly* reduced, and the chance of escape must be *significantly* facilitated, as a result of the confinement or removal. 305 N.W.2d at 745.

After Ronnau's case was tried in 2014, our supreme court decided *Robinson*, in which the defendant challenged the same uniform jury instruction. 859 N.W.2d at 487 (Wiggins, J., specially concurring). The *Robinson* court dismissed the kidnapping charges for insufficient evidence, viewing the jury instructions as law of the case. *Id.* at 482. One justice wrote separately to opine that the confinement instruction "constituted reversible error." *Id.* at 487 (Wiggins, J., specially concurring). The special concurrence expressed: "Even a cursory review of our caselaw would have revealed we repeatedly emphasized the risk of harm must be substantial and the lessened detection and ease of escape must be significant." *Id.* at 492. The special concurrence stated reasonably competent counsel would have considered the claim regarding the

confinement instruction to be "worth raising"—despite the fact that our appellate courts have said we are reluctant to disprove of uniform instructions.[7]  *Id.*

Assuming Ronnau's trial counsel had a duty to object to the confinement instruction without the intensifiers, we cannot find Ronnau suffered prejudice as a result of his counsel's omission.  On our de novo review of the record, we find no reasonable probability the jurors would have acquitted Ronnau of kidnapping if they had been instructed that in determining the existence of confinement or removal, they could consider whether the risk of harm to A.M. was *substantially* increased, whether Ronnau's risk of detection was *significantly* reduced, or whether Ronnau's escape from the scene of the assault was *significantly* facilitated.

Based on the overwhelming evidence that Ronnau confined and removed A.M. from the west side of Iowa Street to the east side of Iowa Street, without her consent, and intentionally subjected her to sexual abuse or serious injury, we find no reasonable probability of a different outcome had counsel objected to the uniform jury instruction.

Therefore, upon our review of the record, we affirm Ronnau's conviction for first-degree kidnapping.

**AFFIRMED.**

---

[7] The special concurrence also urged a "reformulation of the ISBA's instruction" to "include the concept that the defendant's confinement of the victim *substantially* increased the risk of harm, *significantly* lessened the risk of detection, or *significantly* facilitated the risk of escape."  *Robinson*, 859 N.W.2d at 492.  We note the ISBA committee has made that change to Iowa Criminal Jury Instruction 1000.5 (2015).